# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| GOLD BANK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 04-0565-CV-W-FJG |
| | ) |
| POST HILL GREENS, L.L.C., et al. | ) |
| | ) |
| Defendants. | ) |

# ORDER

Currently pending before the Court is Post Hill Green's Motion for Summary Judgment (Doc. # 77) and Gold Bank's Motion in Limine (Doc. # 114).

## I. BACKGROUND

Edgar Barth[1], Eugene Feldhausen and Mark Kalin were all members of Post Hill Greens, L.L.C. ("PHG"). Each member owned a 33 1/3 ownership share in the company. PHG was formed in 1999 to own and further develop real estate in a residential condominium development in Platte County, Missouri known as Post Hill Greens. Gold Bank loaned money to PHG beginning in June 2000 to construct new condominium units in Post Hill Greens. All of the members guaranteed PHG's indebtedness to Gold Bank. At the time Gold Bank first loaned money to PHG in June 2000, Barth also was the managing member of Prospect North, LLC which had previously obtained a loan from Gold Bank, which Barth had also guaranteed. Barth formed Prospect North to develop a mixed use real estate project that involved

---

[1] On February 27, 2006, counsel for Edgar Barth filed a Suggestion on the Record notifying the Court that Mr. Barth had died on February 25, 2006.

commercial, retail and residential uses. This project is also referred to as the Renaissance development. Barth initially was the sole member of Prospect North and employed Kurt Degenhardt to work for Prospect North. In August 2001, Barth assigned Gold Bank his interests in Prospect North to the extent of $750,000 as additional security for Gold Bank loans to PHG. In December 2001, Barth was injured in a fall and as a result was required to undergo dialysis treatment three times a week. His ability to work was substantially reduced after his accident. Barth and Degenhardt each owned a 50% interest in each of the Renaissance entities prior to Barth's sale of his interests to Degenhardt effective October 20, 2003. After the sale, Degenhardt owned 100% of Prospect North and all of the Renaissance entities. In September 2002, PHG was behind on its interest payments to Gold Bank and did not have any cash to continue the development of Post Hill Greens. In October 2002, Degenhardt and Barth had discussions concerning Degenhardt buying out Barth. The parties reached an oral agreement that Degenhardt would pay Barth a cash price of $750,000 and that Barth would not have to repay any loans or advances he had received from Prospect North/Renaissance. This agreement however was conditioned on Gold Bank agreeing to release Barth from his liability to Gold Bank for the Prospect North/Renaissance loans. The Bank agreed to this condition. Barth intended to use some portion of the $750,000 buyout money to assist with the Post Hill Greens project. Degenhardt obtained the funds for the $750,000 cash purchase price from funds available to Prospect North/Renaissance as a result of loans from Gold Bank. The documentation necessary to finalize the sale of Barth's interest in the Prospect North/Renaissance entities was not completed however until October 20, 2003. However, prior to that time,

2

$435,253.91 of the $750,000.00 purchase price was disbursed on behalf of Degenhardt by Prospect North to or for the benefit of Mr. Barth. This disbursement consisted of four payments of funds from Prospect North directly to Barth or on behalf of Barth, to a PHG Account at Gold Bank for payment of expenses including interest payments on loans to Gold Bank. These payments were as follows:

1. $33,140.16 paid by check to Barth;

2. $250,000 transferred from a Renaissance Plaza loan account at Gold Bank to the PHG Account on November 25, 2002;

3. $117,608.43 transferred from a Renaissance Plaza account at Gold Bank to the PHG Account on April 30, 2003 and

4. $34,505.32 transferred from a Renaissance Gardens account at Gold Bank to the PHG Account on June 26, 2004.

In April 2003, PHG entered into an agreement with Gold Bank to renew and consolidate its loans. PHG executed a Promissory Note on that date in the sum of $4,776,063.44 which Note was dated effective December 15, 2002. This note matured on June 15, 2003. Barth, as managing member of PHG executed the renewal of this Promissory Note on June 15, 2003 and the note maturity date was extended until December 15, 2003. PHG failed to pay the interest for October, November and December 2003. PHG failed to pay all the principal due on the Note and Gold Bank made a written demand on PHG, Barth, Kalin and Feldhausen for payment of all sums due. Payment was not made and by letter dated June 23, 2004 Gold Bank gave notice of the Trustee's Sale of real property that secured the note. The sale was held on August 12, 2004. Gold Bank made the only bid at the sale in the sum of $2,243,000.00. Gold Bank argues that this bid exceeded the appraised value of the property by

$200,000.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

## III. DISCUSSION

Due to various stipulations of dismissal which have been filed, the following are the claims which remain: 1) Gold Bank's Breach of Contract Claim against PHG; 2) Gold Bank's Breach of Guaranty claim against Barth; 3) Barth's Equitable Redemption

4

claims against Gold Bank; 4) Barth's Action to Set Aside Foreclosure Sale Due to Constructive Fraud; 5) Barth's Breach of Good Faith action against Gold Bank and 6) Barth's Claim for Violation of 12 U.S.C. §§ 1972 and 1975. The affirmative defenses which Barth and PHG have raised to Gold Bank's claims are identical to Barth's counterclaims.

### A. Gold Bank's Claims Against Barth and PHG

Gold Bank argues that it is entitled to summary judgment on its claims because PHG failed to pay the indebtedness due on the June 15, 2003 note and Barth failed to pay any portion of such indebtedness pursuant to his obligations under the Guaranty. Barth argues in opposition that Gold Bank is not entitled to summary judgment on its claims because these are the same claims as comprise his counterclaims and there are genuine issues of fact regarding the counterclaims which preclude the grant of summary judgment. The Court will therefore proceed to examine the counterclaims.

### B. Barth's Counterclaims regarding Sale of the Property

Gold Bank states that Counts I, II and III of Barth's counterclaims allege different causes of action, but are all based upon the allegation that Gold Bank's winning bid at the foreclosure sale was grossly inadequate. Gold Bank states however, that under Missouri law, inadequacy of price alone is not a sufficient ground to set aside a sale. Gold Bank argues that there is no evidence of fraud. The appraisals obtained by Gold Bank in April and June of 2004 indicated that the value of the entire property was $2,043,000. Gold Bank states that its bid was $200,000 over this appraised value. In opposition Barth acknowledges the general rule that mere inadequacy of consideration

5

is insufficient to set aside a sale. However, he argues that there are exceptions, such as when the amount offered is so low as to shock the conscience. Barth argues that the evidence in this case indicates that Gold Bank did not act in good faith or with absolute fairness when it purchased the property at the sale. Barth argues that Gold Bank previously placed much higher values on the Post Hill Greens property. He states that during the term of the lending relationship, Gold Bank valued the property between $3,700,088 and $7,903,750.

Gold Bank in reply states that Barth's argument that it was required to act in "good faith or with absolute fairness" was based on a case in which substantial irregularities had occurred in relation to the sale. In the instant case, Gold Bank argues Barth has not shown that there were any irregularities with the sale of PHG's property. Gold Bank also states that the appraisals previously relied upon were of different portions of the property and were not of the property as a whole.

>In Trotter v. Carter, 183 S.W.2d 898 (Mo. 1944), the Court stated:
>
>> 'Mere inadequacy of price is not sufficient ground for setting aside a sale under a power in a mortgage or trust deed where the sale was lawfully made and rightly conducted, with full opportunity for competition in the bidding, and without fraud, partiality or oppression. . . . Inadequacy of price is, however, always a circumstance to be considered in connection with other grounds of objection to the sale, and will be sufficient to justify setting the sale aside when coupled with any other circumstance showing unfairness, misconduct, fraud or even stupid management resulting in the sacrifice of the property.'

Id. at 902 quoting 41 Corpus Juris. § 1490 p. 1026. In the instant case, Barth does not argue any other grounds for objection, other than price. As Gold Bank notes, Eugene Feldhausen testified that although there was an issue about whether the bank's bid was a fair market value, that "[a]s far as procedural aspects, I do not recall any procedural

6

deficiencies . . . There were value questions." (Feldhausen Depo. p. 193). The Court agrees and finds that Barth has not come forth with any evidence which in connection with the price Gold Bank paid would offer any grounds sufficient to set aside the sale. Accordingly, the Court hereby **GRANTS** Gold Bank's Motion for Summary Judgment on Barth's Counterclaims (Counts I - III).

### C. Barth's Counterclaim Regarding Violations of Anti-Tying Provisions of the Bank Holding Company Act

In Count IV of the Counterclaim, Barth alleges that Gold Bank violated the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. §§ 1972 and 1975 in the following ways: 1) requiring Barth to transfer his membership interest in the Renaissance North entities to Degenhardt as a condition to secure financing from Gold Bank to PHG; 2) Providing Barth with a line of credit for $750,000; and after providing the line of credit, 3) Making three unauthorized withdrawals from the line of credit to pay PHG indebtedness . These withdrawals include: a) $250,000 on November 26, 2002; b) $117,608.43 on April 30, 2003 and c) $34,505.32 on June 26, 2003.

Gold Bank argues that it is entitled to summary judgment because there is no evidence of any written agreement between Gold Bank and Barth that established a line of credit from Gold Bank to Barth in any amount. While there is evidence that there were three transfers of money from Prospect North/Renaissance's accounts to PHG's account, Gold Bank argues that the evidence shows that these transfers were authorized by Barth. Gold Bank also argues that the deposition testimony establishes that Gold Bank did not force Barth to sell his interests in Prospect North/Renaissance to Degenhardt. Gold Bank argues that in order to show a violation of 12 U.S.C. §

7

1972(1)(c), a plaintiff must establish that: 1) the banking practice at issue was unusual in the banking industry; 2) it resulted in an anti-competitive tying arrangement and 3) it benefitted the bank in some way other than merely allowing the bank additional asset protection. Gold Bank argues that Barth cannot establish these elements and thus cannot establish a violation of the Act.

In opposition, Barth argues that genuine issues of fact exist as to whether Gold Bank's conduct was unusual in the banking industry and that Kent Brown testified that he could not recall any instance where Gold Bank had required a borrower or guarantor to put up a percentage interest in an entity that had a loan relationship with Gold Bank. Additionally, Barth states that there are genuine issues of fact as to whether it was his choice to use his ownership interest in the Prospect North entities to obtain funds to benefit PHG and finally Barth argues that genuine issues of fact exist as to whether Gold Bank's conduct benefitted the Bank. Barth states that the transfers from the Renaissance account to PHG's account resulted in paying down PHG's interest on the loan at a time when the development was at a standstill and when it had no cash to pay the interest. Thus, this resulted in a benefit to the bank.

After reviewing the parties' briefs and the deposition transcripts, the Court determines that Gold Bank did not require Barth to transfer his membership interest in Renaissance North to Degenhardt. The Court also finds that Gold Bank did not provide Barth with a $750,000 line of credit. However, the Court finds that there is disputed testimony regarding whether the transfers from the Renaissance North accounts to PHG's account were done with the knowledge and consent of Barth and whether these actions were usual in the banking industry and benefitted Gold Bank. Therefore, the

8

Court hereby **PROVISIONALLY DENIES** Gold Bank's Motion for Summary Judgment on Count IV of Barth's Counterclaim.  The Court would like the parties to further develop, narrow and clarify this issue.  Accordingly, plaintiff shall provide the Court with a brief addressing this issue.  Barth shall thereafter respond and plaintiff shall then file a reply.  As noted above, because the Counterclaim is directly related to Gold Bank's claims against Barth, the Court will defer ruling on Gold Bank's claims until after the parties have provided further briefing on the remaining counterclaim.

## IV. CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** Gold Bank's Motion for Summary Judgment on Counts I, II and III of Barth's Counterclaims and **PROVISIONALLY DENIES** Gold Bank's Motion for Summary Judgment on Count IV of Barth's Counterclaim (Doc. # 77).  After further briefing to be filed no later than April 17, 2006, the Court will address Count IV of the Counterclaim and Counts I and II of Gold Bank's Claims.  The Court also **PROVISIONALLY DENIES** Gold Bank's Motion in Limine (Doc. # 114).


Date:  March 31, 2006                                  **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                  Fernando J. Gaitan, Jr.
                                                       United States District Judge

9